## LAW OFFICE OF RONALD L. KUBY
ATTORNEYS AT LAW
119 WEST 23ʀᴅ STREET, SUITE 900
NEW YORK, NEW YORK 10011

TELEPHONE: (212) 529-0223
FAX: (212) 529-0644
WWW.KUBYLAW.COM

RONALD L. KUBY
RHIYA TRIVEDI

OF COUNSEL
GEORGE WACHTEL
LEAH BUSBY

STAFF
SUSAN BAILEY
PROCESS SERVER
LUIS R. AYALA 1952-2012

September 11, 2018

**Via ECF**
Hon. Gabriel W. Gorenstein
Chief United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street,
New York, NY
10007-1312

   Re: Jury Trial in *United States v. Patricia Okoumou*, 18-cr-469 (GWG)

Dear Judge Gorenstein,

  Please accept this letter in lieu of a more formal memorandum of law in support of defendant's motion for a trial by jury.

  As defendant noted at our prior appearance, she has no Constitutional right to a trial by jury, despite the fact that she faces a potential sentence of eighteen months. Lewis v. United States, 116 S.Ct. 2163 (1996). And Rule 23, of the Federal Rules of Criminal Procedure merely codifies the process by which a defendant waives that right. Yet this Court retains the inherent authority to order a trial by jury, and should do so in this case.

  This Court's inherent power to supervise the administration of criminal justice, McNabb v. United States, 318 U.S. 332, 340 (1943), permits it to "formulate procedural rules not specifically required by the Constitution or by Congress." United States v. Hasting, 461 U.S. 499, 505 (1983). Preserving judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury, McNabb, 318 U.S. at 345, is one of the basic purposes served by the exercise of such supervisory powers.

  As a general matter, the advent of the Criminal Rules did not eliminate a district.court's inherent supervisory power. Rule 57(b) recognizes that the rules are not designed to be comprehensive; instead, it says,

1

> A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district. No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local district rules unless the alleged violator was furnished with actual notice of the requirement before the noncompliance.

Fed. R. Crim. Pro. 57(b).

In Eash v. Riggins Trucking Inc., 757 F.2d 557 (3d. Cir. 1985) the Third Circuit examined the inherent authority of federal district courts, summarizing relevant jurisprudence and scholarship. The Court found that inherent power has been employed in three general fashions.

The first stemmed from the fact that once Congress has created lower federal courts and demarcated their jurisdiction, the courts are vested with judicial powers pursuant to Article III. This use of inherent power, which might be termed irreducible inherent authority, encompasses an extremely narrow range of authority involving activity so fundamental to the essence of a court as a constitutional tribunal that to divest the court of absolute command within this sphere is really to render practically meaningless the terms "court" and "judicial power." See Levin & Amsterdam, supra, 107 U.Pa.L.Rev. at 30–32. In this limited domain of judicial autonomy, courts may act notwithstanding contrary legislative direction. These inherent powers are grounded in the separation of powers concept, because to deny this power "and yet to conceive of courts is a self-contradiction." Frankfurter & Landis, supra, 37 Harv.L.Rev. at 1023; see Levin & Amsterdam, supra, 107 U.Pa.L.Rev. at 33; see also United States v. Klein, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1872).

The second was as a matter of necessity, namely, the power to fashion enforcement mechanisms like sanctions. And the third form of authority subsumed under the general term inherent power implicates powers necessary only in the practical sense of being useful. An early example is Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920), in which the Supreme Court determined that "the court possesses the inherent power to supply itself" with an "auditor" to aid in its decision-making. Id. at 312, 40 S.Ct. at 547. "Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties," and to appoint "persons unconnected with the court to aid judges in the performance of specific judicial duties." Id., see also Ruiz v. Estelle, 679 F.2d 1115, 1161 (5th Cir.1982), cert. denied, 460 U.S. 1042 (1983); Schwimmer v. United States, 232 F.2d 855, 865 (8th Cir.), cert. denied, 352 U.S. 833 (1956). Thus, this Court has wide, broad and deep inherent authority that certainly extends to employment of a jury.

Three limiting principles cabin the inherent authority to regulate practice. First, the court is powerless to contradict the Rules where they have spoken. Carlson v. United States, 837 F.3d 753 (7th Cir. 2016). The Supreme Court has repeatedly stated that

permissive rules do not "abrogate the power of the courts" to exercise their historic "inherent power" when doing so does not contradict a rule. Link v. Wabash R.R. Co., 370 U.S. 626 (1962) (with respect to FED. R. CIV. P. 41(b)). In 2016, the Court re-affirmed this principle. Dietz v. Bouldin, 136 S. Ct. 1885, 1892 (2016).

A permissive rule—that is, a rule that permits a court to do something and does not include any limiting language—should not give rise to a negative inference that it abrogates the district court's inherent power without a "clear [ ] expression of [that] purpose." Link, 370 U.S. at 631–32; G. Heileman Brewing Co. v. Joseph Oat Corp., 871 F.2d 648, 652 (7th Cir. 1989) ("mere absence of language in the federal rules specifically authorizing or describing a particular judicial procedure should not, and does not, give rise to a negative implication of prohibition").

Rule 23 is permissive on the subject of the choice between a jury and bench trial. 23(a) articulates the three requirements for a valid waiver of jury trial *when a defendant is entitled* to a jury trial pursuant to the Sixth Amendment. 23(c) governs "case[s] tried without a jury" but does not include any language suggesting that *all* cases that do not meet the requirement of 23(a) are bench trials by default.

Put another way, Rule 23 speaks only to cases where a jury is a matter of right, and cases where a bench trial is being conducted. The Rule does not preclude a jury trial as an exercise of the court's inherent authority. *Contra* U.S. v. Diaz-Clark, 292 F.3d 1310 (11th Cir. 2002) (finding no inherent authority because the Rules had explicitly spoken to the issue of time limits for correcting sentences); Carlisle v. U.S., 517 U.S. 416 (1996) (same).

Second, the local procedural rule must not be outcome determinative. *See* Colgrove v. Battin, 413 U.S. 149 (1973) (upholding the validity of a local rule providing for a jury of six in a civil trial because the local "requirement of a six-member jury is not a 'basic procedural innovation,'" which the Court defined as "those aspects of the litigatory process which bear upon the ultimate outcome of the litigation.") (internal citations omitted).

A jury trial is not sought for outcome-determinative reasons, but instead, in the interests of procedural justice. The legality or illegality of actions taken in conscience—taken because of a higher moral calling—can and should be judged by a jury of one's peers. While the severity of the possible consequences governs *entitlement* to a jury, Ms. Okoumou's case presents an altogether different question: whether the legality of actions taken to advance aspirational social principles and to offer social commentary are best reserved for the conscience of the community as a procedural matter.

Last, the exercise of an inherent power must be a "reasonable response to the problems and needs" confronting the court's fair administration of justice. Degen v. United

3

States, 517 U.S. 820, 823–824 (1996). It is this final criterion that guides the Court in the exercise of its discretion.

Shortly after 3 p.m. on July 4, 2018, Patricia Okoumou scaled the base of the Statue of Liberty. She did so in protest of the nearly-one-month old policy of separating children from parents at the border so that parents could be criminally prosecuted for illegal entry. Almost immediately, her actions received national and international attention that continues today.

At the time of Ms. Okoumou's protest, international, non-partisan and interdisciplinary condemnation of the 'zero tolerance' policy of family separation had already commenced. Countless influential public figures abandoned the confines of political party and convention to voice opposition: Republican Former First Lady Barbara Bush wrote to the current President and compared his actions to the internment of Japanese Americans; 75 former U.S. Attorneys protested directly to the Attorney General. Medical and scientific communities, religious groups, academics, civil rights and humanitarian associations, and political caucuses joined the growing chorus of opposition. Ultimately, Ms. Okoumou added her voice, and her body, to the already resounding and immeasurably diverse cry to end family separation; she was, by no stretch of the imagination, alone, nor was the campaign she sought to wage, a niche one.

"A federal court has the responsibility to supervise the administration of criminal justice in order to ensure fundamental fairness." United States v. Baird, 414 F.2d 700, 710 (2d Cir. 1969), cert. denied, 396 U.S. 1005 (1970). Fundamental fairness requires that actions taken in conscience be judged by the conscience of the community.

Throughout history, courts have upheld juries as a check on "justices…who might…imprison dispatch, or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure." 4 W. Blackstone, Commentaries on the Laws of England 349-50 (1769). The Constitution thus, contrived "that the truth of every accusation…should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion. Id.

In the case of an issue being weighed, debated, protested, and championed across the country, it is one of our most venerated institutions—a jury selected from a fair cross-section of the community—that is best equipped to render a verdict. Such a verdict, coming from the citizenry of the community affected by the conduct, would lend a legitimacy to the ultimate verdict that simply cannot be obtained in any other fashion.

As the Supreme Court of the United States has said, "when juries differ with the result at which the judge would have arrived, it is usually because they are serving some of the very purposes for which they were created and for which they are now employed." Duncan v. State of Louisiana, 391 U.S. 145, 157 (1968).

Sincerely,

Ronald L. Kuby
Rhidaya "Rhiya" Trivedi